On Application for Rehearing
The opinion of November 19, 1999, is withdrawn and the following opinion is substituted therefor.
A jury convicted Gary Drinkard of murder made capital because it was committed during a robbery in the first degree. Ala. Code 1975, § 13A-5-40(a)(2). Drinkard waived his right to a sentencing hearing before the jury. At his sentencing hearing before the judge, Drinkard spoke in his own behalf, but offered no evidence of mitigating circumstances; the trial court sentenced him to death. The Court of Criminal Appeals affirmed the conviction and sentence. Drinkard v. State, 777 So.2d 225 (Ala.Crim.App. 1998). We reverse and remand.
The trial court, over Drinkard's objection, allowed the State, during the guilt phase of the trial, to introduce evidence indicating that Drinkard had been involved in a theft committed by Beverly Robinson and Rex Segars, a theft that was unrelated to the murder. Evidence of a defendant's prior bad acts, such as Drinkard's involvement in the theft, is generally inadmissible. Such evidence is presumptively prejudicial because it could cause the jury to infer that, because the defendant has committed crimes in the past, it is more likely that he committed the particular crime with which he is charged — thus, it draws the jurors' minds away from the main issue. Ex parte Cofer, 440 So.2d 1121 (Ala. 1983). We conclude that in this case no exception to the exclusionary rule applied to make the evidence admissible. The admission of that improper evidence requires that we reverse Drinkard's conviction.
In its opinion, Court of Criminal Appeals recited the facts as they were presented by the trial court in its sentencing order:
 "`Dalton Pace, the 62-year-old victim of this crime, lived on Old Moulton Road in Decatur where he operated a vehicle parts business and junkyard out of his *Page 297 
home. Pace had a reputation for carrying large amounts of cash on his person. According to his former wife, who handled Pace's business banking and paperwork, he carried three rolls of cash: one to buy trucks and parts, one to make change for customers and one to be deposited in the bank when it accumulated to $2,000. He also regularly carried ten $100 bills in his wallet.
 "`About 4:30 p.m. on August 18, 1993, Pace's son stopped by to assist his father in removing an engine from a truck. He observed a large "wad" of cash in his father's shirt pocket. That same day, Perry Davis bought a truck motor from Pace. He paid $550 for the motor and saw Pace put the cash in the front pocket of his pants.
 "`Between 9:00 and 10:00 on the evening of August 18, Pace's next-door neighbor, Buster Smith, heard a banging sound coming from the vicinity of Pace's home. Smith paid no particular attention because his neighbor was always slamming doors and sometimes shooting his guns. Smith later heard a car make a sound like spinning gravel and saw a 1976 to 1978 model Ford LTD speed by the front of his home. The vehicle's . . . taillight on the driver's side did not work.
 "`At about 4:30 p.m. on August 19, 1993, one of Pace's friends found him lying dead on the floor of his home. Police investigators found 40 cents in one of Pace's pockets and his wallet containing ten $100 bills in another. There was no other cash on Pace's body or at the crime scene. The investigators also recovered a .45 caliber bullet casing near Pace's body and another in the kitchen of his home.
 "`Dalton Pace suffered three gunshot wounds: one in his chest and two in his back — all three of which were lethal. The medical examiner recovered a bullet fragment from the victim's body. Analysis of this fragment and the shell casings found at Pace's home disclosed that a .45 caliber ACP type revolver fired all three bullets. This type of weapon included a Smith Wesson .45 caliber ACP revolver.
 "`In July 1993, Robert James Fayard sold the defendant, Gary Wayne Drinkard, a .45 caliber Smith Wesson Colt-style revolver with a circle clip which held three bullets. Between a month to two weeks before Pace's death, Rex Segars saw a .45 caliber Colt-style revolver in the defendant's possession and actually fired it. After his arrest for killing Pace, the defendant told Robert Fayard to say that he had sold him a .45 caliber revolver frame that had a .38 caliber barrel or that shot .38 caliber bullets.
 "`Six to eight weeks before Pace's death, the defendant told Rex Segars in a conversation overheard by the defendant's half-sister, Beverly Robinson, that he knew where to get some easy money. As Robinson recalled the conversation, the defendant said an old man named Dalton Pace ran a junkyard and kept a wad of money on him. A few weeks later, Robinson and Segars ran into the defendant who again stated they could get the money easy. He asked Segars if he wanted to go in on it.
 "`Rex Segars testified that in the first conversation on this subject, the defendant said he knew a guy who owned a junkyard in Decatur and kept a large amount of money. The defendant described the man as "a big old S.O.B." who would have to be killed to get his money. In a later conversation about a month before Pace's death, the defendant told Segars basically the same thing and repeated that he was thinking about robbing Pace but would have to kill him.
 "`According to Michael Riggs, who worked for the defendant in the summer of 1993, his boss told him in about early July that he knew where `somebody could make a good lick.' The defendant stated that an old man who was a junk dealer on Highway 24 kept a good bit of money on him. But, according to the *Page 298 
defendant, a person would have to kill "the S.O.B." because he would not give up his money. Riggs described the defendant as appearing serious and cold-hearted when this conversation took place.
 "`The night after Pace was robbed and murdered, the defendant told Rex Segars that he shot the victim three or four times — once in the front and three more times in the back — but he was still alive. The defendant worried that Pace had survived and asked Segars if he knew where he could get a "hot" pistol so he could go to the hospital and finish him off. According to the defendant, he got only $2,200 from robbing Pace. He also stated that the victim had grabbed his arm and tore his sleeve. Segars saw what appeared to be claw marks on the defendant's side.
 "`Between his arrest on August 28, 1993, on a marijuana possession charge and his arrest on September 1, 1993, for the capital murder of Dalton Pace, the defendant told Beverly Robinson and Rex Segars that he was not worried about the police catching him because they had no money, fingerprints, eyewitnesses or gun. At the time of his arrest, the police found in the trunk of the defendant's 1978 Ford LTD a broken left rear taillight assembly which was on the vehicle at one time.'"
777 So.2d at 234-35.
Drinkard raises 29 issues on this certiorari review. Because we conclude that the trial court erred to reversal in allowing the State, in the guilt phase, to introduce evidence of Drinkard's prior bad act, we need not address each of these issues. However, we feel compelled to comment on some of them because they may arise at a new trial.
 I.
Two of Drinkard's issues must be addressed together. First, Drinkard claims that the trial court improperly allowed the State to introduce an incomplete version of a statement obtained from him. Second, he claims that the trial court improperly allowed the State to introduce evidence indicating that he had been an accomplice in a burglary. The trial court held that Drinkard had "opened the door" to testimony about his involvement in the burglary when he elicited the full version of the statement.
Before Drinkard's arrest for the murder of Pace, Beverly Robinson telephoned the police and reported that Drinkard was involved. During the conversation with police, Robinson indicated that there was stolen property in her house. She and Rex Segar, her common-law husband, were arrested after the police conducted a search of their home. As a part of a plea bargain, the State agreed to dismiss all of the charges against Robinson if she would testify truthfully against Drinkard and if she would wear a concealed microphone and secretly tape a conversation with him.
The police wired Beverly Robinson and instructed her to attempt to obtain a confession from Drinkard. Investigator Gary Walker listened to the conversation as it occurred; however, there was a problem with the equipment, and static interfered with portions of the transmission. After the conversation, Robinson wrote a report detailing it. The conversation was taped, but the tape itself was not introduced into evidence at Drinkard's trial.
During the conversation, Robinson brought up a newspaper article she had seen about the murder. Drinkard replied by stating that he had known Pace, that he had bought parts from Pace, and that Pace "was a pretty good guy." (R. 2038.) Drinkard then made statements that could have implicated him in the murder; for instance, Robinson testified: "And then his [Drinkard's] voice got loud and he said, `He was a big fucker.' He said, `I realized that when he grabbed my arm and ripped my sleeve.' Drinkard also made statements which could be considered exculpatory. *Page 299 
On cross-examination, Beverly testified that she tried to get Drinkard to say something about the murder, by expressing a concern that maybe the police thought Rex Segar was involved in the murder. Drinkard's counsel elicited this portion of the conversation to show that Drinkard had failed to mention the murder in response to Beverly's concerns. Drinkard, in response to Robinson's statements, simply stated that he thought the police were merely concerned with the stolen property found in Robinson and Segar's home:
 "Q. [MR. KING, defense counsel] Something I noticed you haven't mentioned in your testimony, your statement to Investigator Walker, which I'll let you review if you'd like to, I noticed you made several statements to Mr. Drinkard stating — well, you made one statement that said, `I said, what has Rex done?' Do you recall asking Gary that?
"A. [BEVERLY ROBINSON] Yes, sir, I do.
"Q. And do you recall asking him, `Did Rex kill that man?'
"A. Yes, sir, I did.
 "Q. Do you recall asking him, `Is there anything I need to get rid of?'
"A. Yes, sir.
 "Q. Do you remember again asking him, `Are there any clothes in the trailer I need to get rid of?'
"A. I asked him several times, yes, sir.
 "Q. And isn't it true that Gary made a statement to you after they'd been arrested that this was all about the stolen property in your trailer?
 "A. No, sir. I think his words were, excuse me, `It was all bullshit.' I didn't have anything to worry about.
"Q. That you didn't have anything —
"A. Right.
". . . .
 "Q. Let me show you page six of your statement to Investigator Walker. Didn't or doesn't the statement say, quote, that it concerned the stolen merchandise at your house?
"A. I'm sorry. Can you repeat your question to start with?
 "Q. Didn't — doesn't this report which you wrote say that Gary told you that it concerned stolen merchandise at the house?
"A. Yes, sir.
 "Q. And I'll have you flip to the next page if you would, please, ma'am. You see the part I've underlined?
"A. Yes, sir.
"Q. Doesn't it say, `It's just his parole violation'?
"A. Yes, sir.
 "Q. In fact, it says, Rex can beat the charges they had against him. It's just his parole violation.
"A. Yes, sir.
"Q. And that's what you wrote down?
"A. Yes, sir."
On re-direct examination, the State immediately began asking questions concerning Drinkard's involvement with the stolen property in Robinson and Segar's house:
 "Q. [MR. MATTHEWS, prosecutor] How was it that Gary knew so much about these thefts that were involving y'all and the stolen property in your house?
"A [BEVERLY ROBINSON] How did he know about them?
"Q. Yes, ma'am.
 "A. Well, number one, he knew Robbie Fayard enough to tell us when Robbie wasn't at home —
 "MR. DIGIULIAN [for the defense]: Judge, we're going to object to this. This is — this goes in —
 "THE WITNESS: I don't understand how to answer some of these questions.
 "MR. MATTHEWS: Wait just a minute while he's talking. Wait just a minute while he's talking.
 "MR. DIGIULIAN: This goes into what we have filed in our motion in limine. *Page 300 
 "MR. MATTHEWS: I didn't ask about it, Judge. They opened the door and asked about the whole situation and went into all the details.
 "THE COURT: I'm going to overrule. Y'all did. Y'all opened the door. I'll allow him to go into it."
Following this exchange, Robinson was permitted to testify about Drinkard's involvement with the stolen property. She described how Drinkard would tell her or Segar that certain people would not be home. She testified that she and Segar would then burglarize their houses. She specifically stated that Drinkard had been involved in the burglary of Robbie Fayard's home.
Drinkard first claims that the trial court incorrectly allowed the State to present only a portion of the conversation with Robinson in which Drinkard implicated himself. Drinkard made no objection at trial. The Court of Criminal Appeals held that introducing only one portion of the conversation was not plain error. In its opinion, the Court of Criminal Appeals stated: "Robinson testified that nothing more was said in the conversation that pertained to the murder. More importantly, nothing prevented [Drinkard] from questioning Robinson or Walker on cross-examination about the entire conversation." Drinkard v. State, 777 So.2d at 280.
 "If a part of a conversation is adduced in evidence by the state as proving the defendant's declarations or confessions of guilt, the defendant has the right to call for the whole of what was said in that conversation relative to the subject matter of the issue. Chambers v. State, 26 Ala. 59
(1855); William v. State, 39 Ala. 532 (1865); Mullis v. State, 258 Ala. 309, 62 So.2d 451 (1953). The accused is entitled, on cross-examination, to bring out all that he said, at the same time and on the same subject. Parke v. State, 48 Ala. 266 (1872)."
King v. State, 355 So.2d 1148, 1151 (Ala.Crim.App. 1978). In King v. State, the Court of Criminal Appeals relied upon this Court's holdings in Chambers v. State, William v. State, Mullis v. State, and Parke v. State, when it stated:
 "A confession should be considered in its entirety. If the state introduced into evidence only a portion of an alleged confession, a defendant is entitled to introduce the remainder of what was said to and by him, including any exculpatory statements which would bear upon the matter in controversy."
355 So.2d at 1151. Drinkard introduced what he claimed were exculpatory statements left out of the testimony introduced by the State.
Drinkard exercised his right to introduce the whole conversation, including the exculpatory statements. The fact that Drinkard's response to Robinson, when she asked Drinkard if "Rex kill[ed] that man," concerned a totally different subject raises the possibility that he knew nothing about the murder. Therefore, those statements (about the stolen property at Robinson and Segar's home) not only concerned the same subject, they were also exculpatory. Drinkard's response to Robinson's questions did not mention the murder; however, it bears upon the matter in controversy. The Court of Criminal Appeals was correct when it stated that there was no error when the State introduced part of the conversation, because the trial court properly allowed Drinkard to introduce the remainder of the conversation.
However, Drinkard also argues that the trial court improperly allowed the State to introduce extrinsic evidence of prior bad acts on his part. "Evidence of other and distinct crimes is as a general rule not admissible." Vincent v. State, 231 Ala. 657,660, 165 So. 844, 846 (1936).
 "`This exclusionary rule is simply an application of the character rule which forbids the state to prove the accused's bad character by particular deeds. The *Page 301 
basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.'"
Ex parte Arthur, 472 So.2d 665, 668 (Ala. 1985) (quoting Charles W. Gamble, McElroy's Alabama Evidence, § 69.01(1) (3d ed. 1977)).
 "The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3)relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes."
Stallworth v. State, 662 So.2d 1222, 1224 (Ala.Crim.App. 1995) (quoting earlier cases). In this case, none of these exceptions applies. The evidence concerning Drinkard's alleged involvement with the stolen property in Robinson and Segar's home is completely collateral to the crime with which he was charged. The only argument made in favor of the introduction of evidence concerning Drinkard's connection to the stolen property in Robinson and Segar's home was that Drinkard had opened the door with his cross-examination of Robinson.
In upholding the trial court's ruling on this issue, the Court of Criminal Appeals relied on its opinion in Walker v. State, 631 So.2d 294 (Ala.Crim.App. 1993). The Court of Criminal Appeals' reliance on Walker is misplaced. In Walker, the defendant successfully objected to the prosecutor's asking questions or presenting evidence about the defendant's gang membership. Thereafter, the defense repeatedly brought up the subject of the defendant's gang membership. When the prosecution pursued the subject, the defense objected; the trial court polled the jurors to ascertain if they could put the improper comments out of their minds. When the defendant raised the issue on appeal, the Court of Criminal Appeals held:
 "The appellant cannot be heard to complain `"about exploration of the issue . . . which he himself improperly injected into the trial."[Citations omitted.] "Rebuttal evidence, even evidence of prior crimes, is generally admissible within the sound discretion of the trial court."'"
Walker v. State, 631 So.2d at 301.
Drinkard did not improperly inject the issue of his prior offense into the trial. Drinkard elicited the remainder of the conversation he had with Robinson. The Court of Criminal Appeals recognized that nothing should prevent Drinkard from introducing the remainder of that conversation. 777 So.2d at 279-80. Therefore, Drinkard did not inject the issue of his involvement in the theft or even the theft itself into the trial. He injected, properly, his portion of a conversation where he referred to stolen property at Beverly Robinson's home, in his answer given to reassure her that Rex had probably not been arrested for the murder of Pace.
The Court of Criminal Appeals also cited Stallworth v. State,662 So.2d 1222, 1224 (Ala.Crim.App. 1995) (where the evidence was relevant to identity, as well as plan, scheme, or system), and Sistrunk v. State, 630 So.2d 147 (Ala.Crim.App. 1993) (where the evidence was admissible to explain away an adverse inference created by the cross-examination of a prosecution witness), to support the proposition that evidence of Drinkard's prior bad acts was properly admitted. However, Stallworth is inapplicable, because the fact that Drinkard told Beverly when Fayard would not be at home so that she and Rex could burglarize Fayard's home does not show a scheme or plan being used to prove identity, where the victim, Pace, was robbed and murdered while he was at home. Sistrunk is likewise inapplicable, because no adverse *Page 302 
inference was raised by Drinkard's cross-examination of Robinson.
Further, even if Drinkard had raised the issue, there are several reasons why the State could not use the evidence. First, the testimony elicited by Drinkard was limited to what was said in a specific conversation. This testimony "opens the door" for the State to elicit the remainder of that particular conversation. See Logan v. State, 291 Ala. 497, 502, 282 So.2d 898, 903 (1973) ("when the defendant, on cross-examination of a witness[,] elicits part of a conversation, the State may in rebuttal show the entire conversation"); Whitley v. State, 607 So.2d 354, 360
(Ala.Crim.App. 1992) ("The state, however, is limited to introducing `only so much of the remainder of the statement or conversation . . . as relates to the subject-matter of the part brought out by the [defendant].'"). Testimony about a particular conversation, however, does not grant the State free rein to go outside the conversation and bring in extrinsic evidence. "By its very terms, the doctrine of completeness relates only to matters contained in a single conversation." Dawson v. State, 675 So.2d 897, 905
(Ala.Crim.App. 1995) (opinion on application for rehearing). Second, the State was not rebutting anything brought out by Drinkard on cross-examination. Drinkard did not elicit evidence indicating that he had never been involved in the burglary or that he had never burglarized a home. He simply inquired further into a conversation that the State had introduced. Third, the State was not attempting to explain any adverse inferences raised by the cross-examination. The State was not trying to disprove that portion of the conversation. Defense counsel's question to Robinson dealing with her conversation with Drinkard about Segars did not raise any adverse inference as to Robinson's direct testimony.
Had the State itself introduced the entire conversation between Robinson and Drinkard, including Drinkard's statements about the stolen property at Robinson's house, the State could not have then explained Drinkard's knowledge of the stolen property through evidence indicating his involvement in a prior theft. The State introduced part of the conversation. Drinkard was entitled to elicit the remainder of the conversation. He did not improperly inject into the trial the issue regarding the burglary. Therefore, the trial court erred when it allowed the State to examine Robinson concerning Drinkard's prior offenses.
This Court has held that the exclusionary rule prevents the State from using evidence of a defendant's prior bad acts to prove the defendant's bad character and, thereby, protects the defendant's right to a fair trial. See Ex parte Cofer,440 So.2d 1121, 1123 (Ala. 1983).
 "Evidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant. It interjects a collateral issue into the case which may divert the minds of the jury from the main issue. Kilpatrick v. State, 51 Ala. App. 352, 285 So.2d 516 (1973), cert. denied, 291 Ala. 628, 285 So.2d 525 (1973). Therefore the admission of such evidence constitutes reversible error. Hinton v. State, 280 Ala. 48, 189 So.2d 849 (1966)."
Ex parte Cofer, 440 So.2d at 1124. See also Ex parte Lacy,639 So.2d 951 (Ala. 1993); Ex parte Smith, 581 So.2d 531, 534 (Ala. 1991); Ex parte Arthur, 472 So.2d 665 (Ala. 1985); Dozier v. State, 596 So.2d 49 (Ala.Crim.App. 1991). The prejudicial effect of the evidence offered by the State, evidence indicating that Drinkard had participated in a burglary with Robinson and Segars, requires that Drinkard's conviction be reversed and this case remanded for a new trial.
 II.
Although we reverse for the reasons stated above, we address the following additional issues because they will probably come up again on a new trial: (A) Was the grand-jury foreperson chosen in a racially discriminatory manner? (B) Should this *Page 303 
Court overrule its decision in Ex parte Stewart, 730 So.2d 1246
(Ala. 1998)? (C) Did the state improperly strike jurors on the basis of race and gender?
 A. Choosing The Grand-Jury Foreperson
Drinkard was indicted by a Morgan County grand jury. He claims that the manner by which the grand-jury foreperson in his case was selected violates the Equal Protection Clause of theFourteenth Amendment and his due-process rights guaranteed by the United States Constitution; the Alabama Constitution; and other Alabama law. We address this issue because it remains justiciable with respect to the indictment by which Drinkard was charged. Although Drinkard is white, he has standing to challenge the alleged discriminatory exclusion of blacks from a grand jury, on the basis of equal-protection guarantees. The United States Supreme Court has held recently that a white defendant "has standing to raise an equal protection challenge to discrimination against black persons in the selection of his grand jury." Campbell v. Louisiana, 523 U.S. 392, 118 S.Ct. 1419,1424 (1998). In Campbell, however, the Supreme Court did not hold that a defendant has standing to raise an equal-protection issue by a challenge to the selection of the grand-jury foreperson. Campbell,523 U.S. at 397-403, 118 S.Ct. at 1423-25. Because we hold that the method of selecting grand-jury forepersons in Morgan County is not discriminatory, we need not today determine if a white defendant has standing to raise an equal-protection challenge.
The State argues that this Court has previously held that the method of selecting grand-jury forepersons in Morgan County was not discriminatory. See Pace v. State, 714 So.2d 332 (Ala. 1997). Drinkard argues that our holding in Pace merely dealt with the application of the plain-error doctrine to the issue. In Pace, this Court held that there had been a history of discrimination in the selection of grand-jury forepersons in Morgan County, but it did not reverse the Court of Criminal Appeals' affirmance of the defendant's conviction, because the defendant had not properly preserved the issue for appeal. We held that the discrimination did not rise to the level of plain error. Drinkard objected to the manner by which the foreperson of the grand jury that returned the indictment against him was selected. Therefore, the plain-error analysis of Pace does not apply here.
We must still answer the question whether the manner by which the grand-jury foreperson was selected was discriminatory, using the criteria applied by the United States Supreme Court in Rose v. Mitchell, 443 U.S. 545, 565 (1979). The United States Supreme Court in Rose set forth three criteria for determining if the defendant has made a prima facie showing that the manner of selecting a grand-jury foreperson is racially discriminatory:
 "`The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. . . . Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time. . . . This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class. . . . Finally . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.'"
Rose v. Mitchell, 443 U.S. at 565 (quoting Castaneda v. Partida,430 U.S. 482, 494 (1977)).
First, it has been long established that African-Americans make up a recognizable, *Page 304 
distinct class. Second, we must analyze the history of discrimination. Before our holding in Pace, there had never been a black grand-jury foreperson in Morgan County. Drinkard was tried in 1995, the same year this Court, in Pace, addressed Morgan County's method of selecting grand-jury forepersons; this means that at the time of Drinkard's indictment there was no record indicating any black had ever served as grand-jury foreperson in Morgan County. Because 10% of the population in Morgan County is black, before 1997 there was a marked degree of underrepresentation.
However, the third criterion is whether the selection method is "susceptible of abuse or is not racially neutral." Morgan County has recently changed its method of selecting grand-jury forepersons. Before 1993, the trial court appointed grand-jury forepersons, based on the recommendation of the prosecutor. Since that time, grand-jury forepersons have been selected by the members of the grand jury itself. As we noted in Pace, the "new procedure [in which the grand-jury members themselves choose the grand-jury foreperson] should limit any appearance of discrimination in the judicial process." 714 So.2d at 338, n. 6.
Allowing the grand jury the freedom to choose its own foreman forecloses a question of discrimination in the judicial process. However, even if we assumed that such discrimination did occur, we would hold, as the United States Supreme Court did in Hobby v. United States, 468 U.S. 339, 346 (1984), that because of the ministerial function of grand-jury forepersons in Alabama, there is no invasion of the "the distinctive interests of the defendant protected by the Due Process Clause."
In Hobby, the United States Supreme Court proceeded on the assumption that discrimination had occurred in the selection of the grand-jury foreperson. Today, we use the Supreme Court's analysis to determine if Drinkard's indictment should be dismissed. When determining if such discrimination requires the dismissal of an indictment, the Supreme Court in Hobby looked at two factors: First, was the grand jury itself properly constituted? Second, did the grand-jury foreperson have more than a ministerial function in the grand-jury process?
The Court in Hobby looked at the constitution of the grand jury itself because "[t]he due process concern that no `large and identifiable segment of the community [be] excluded from jury service,' Peters v. Kiff, 407 U.S. [493], at 503 [(1972)], does not arise when the alleged discrimination pertains only to the selection of a foreman from among the members of a properly constituted federal grand jury." 468 U.S. at 345. Drinkard has not shown that the grand jury itself was improperly constituted. Indeed, the record indicates that of the 18 grand-jury members, 2 were black, and that blacks make up only 10% of the population in Morgan County. Therefore, the grand jury itself was an appropriate representation of the community as a whole and was properly constituted.
Second, the Supreme Court in Hobby held that, given the ministerial role of a federal grand-jury foreman, "discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness." 468 U.S. at 345. The United States Supreme Court distinguished the role of the federal grand-jury foreman, as discussed in Hobby, from the role of a Tennessee grand-jury foreman, as discussed in Rose v. Mitchell, supra:
 "Under the federal system, by contrast, the foreman is chosen from among the members of the grand jury after they have been empaneled, see Fed. Rule Crim. Proc. 6(c); the federal foreman, unlike the foreman in Rose, cannot be viewed as the surrogate of the judge. *Page 305 
So long as the grand jury itself is properly constituted, there is no risk that the appointment of any one of its members as foreman will distort the overall composition of the array or otherwise taint the operation of the judicial process."
Hobby, 468 U.S. at 348. This Court in Pace examined the role of the grand-jury foreperson that was discussed in Rose v. Mitchell and compared that to the role of the grand-jury foreperson in Alabama:
 "In Rose, the Supreme Court noted that Tennessee grand jury forepersons, in addition to the ministerial functions of presiding over the grand jury, administering oaths to witnesses, and signing indictments and subpoenas, had a substantive duty to assist the district attorney in the investigation of crimes. 443 U.S. at 548, n. 2. In contrast, Alabama grand jury forepersons have no duty to assist the district attorney in the investigation of crimes and are generally limited to merely reporting grand jury votes and signing the appropriate paperwork prepared by the court or the district attorney. Rule 12.5, Ala. R. Cr. P.
 ". . . Unlike the dominant and authoritative role the Tennessee grand jury foreperson played in Rose, the role of the grand jury foreperson in this case was to perform merely ministerial tasks. The Tennessee grand jury foreperson in Rose had a virtual veto power over the indictment process because under Tennessee law the failure of the foreperson to sign an indictment renders the indictment `fatally defective.' 443 U.S. at 548, n. 2. In contrast, the role of a grand jury foreperson in Alabama is so ministerial that even his or her failure to participate in deliberations and to vote with the panel is not fatal to the indictment. . . . Noah [v. State, 494 So.2d 870 (Ala.Crim.App. 1986)]."
Pace, 714 So.2d at 338.
This Court concluded in Pace that "[i]n this state, the function of a grand jury foreperson is almost entirely ministerial in nature, very similar to that of a federal grand jury foreperson." 714 So.2d at 336. Because the grand jury itself was properly constituted and the grand-jury foreperson in Alabama performs a ministerial function similar to that of the foreperson in the federal court, we conclude that the grand jury in Drinkard's case was not tainted to the point that Drinkard's due-process rights were infringed.
 B. Allowing the Jury to Separate Over Objections of the Defense and the Prosecution
Drinkard contends that the trial court erred by allowing the jury to separate, over the objections of both the defense and the prosecution. The Court of Criminal Appeals correctly stated in its opinion that this Court had recently addressed that issue and had decided it in a way that was adverse to Drinkard. We addressed the issue in Ex parte Stewart, 730 So.2d 1246 (Ala. 1998), where we held that a trial court may allow the jury to separate over defense counsel's objections. Drinkard asks us to reconsider our holding in that case. Stewart provided the correct interpretation of the interplay between this Court's rules, "general act[s] of statewide application," and the Alabama constitution. See Ala. Const. Amend. 328, § 6.11.
 C. Alleged Violations of Batson v. Kentucky[1]
Drinkard claims that the State struck prospective jurors based on gender and race. He relied on the fact that the State peremptorily struck four of six black veniremembers and struck six females. Drinkard, however, objected only to two of the six strikes of females, and the trial court held that he had made no prima facie showing of discrimination based on gender. The trial court acknowledged that the strikes against the four black veniremen *Page 306 
"supplied an inference of discrimination." See Drinkard v. State,777 So.2d at 261.
The prosecution then provided its explanations for the strikes. As to three of the struck jurors, Mr. L., Ms. S., and Ms. T., the prosecution stated valid race-neutral reasons that were discussed during voir dire.[2] These three jurors had either expressed doubt about their ability to impose the death penalty or had relatives that had been murder victims. However, the prosecution's reason for striking the fourth juror, Mr. T. — his involvement with law enforcement and his position as a radio talk-show host — is unsubstantiated by the record. We have said repeatedly that "the failure of the State to engage in any meaningful voir dire on a subject of alleged concern is evidence that the explanation is a sham and a pretext for discrimination." Ex parte Bird, 594 So.2d 676, 683 (Ala. 1991), citing Ex parte Branch, 526 So.2d 609 (Ala. 1987). "The trial judge cannot merely accept the specific reasons given by the prosecutor at face value. . . ." Ex parte Branch, 526 So.2d at 624. While we understand that the publicity surrounding Mr. T. and his involvement with the Decatur police might be common knowledge, to allow a peremptory strike on that basis would encourage the use of presumption instead of documentation to support the prosecutor's reasons for striking a juror. If Mr. T's activities cause the prosecutor to have concerns about his ability to be fair, then "a simple question directed to the veniremember could have dispelled any doubt" about his ability to hear the case fairly. Ex parte Bird, 594 So.2d at 683. However, the State referred to an answer given by Mr. T., which the prosecutor believed indicated that Mr. T. would hold the testimony of the police officers to a tougher standard. The trial judge agreed that the State had given a race-neutral reason. We can reverse a trial court's determination on a Batson issue only if it is "clearly erroneous"; therefore, we cannot hold that there was a Batson violation in this instance. Ex parte Branch, 526 So.2d at 625. We address the issue to make clear the point we made in Ex parte Branch:
 "The trial judge cannot merely accept the specific reasons given by the prosecutor at face value; the judge must consider whether the racially neutral explanations are contrived to avoid admitting acts of group discrimination. This evaluation by the trial judge is necessary because it is possible that an attorney, although not intentionally discriminating, may try to find reasons other than race to challenge a black juror, when race may be his primary factor in deciding to strike the juror."
526 So.2d at 624 (citations omitted).
 Summary
The introduction of evidence concerning Drinkard's involvement with an unrelated theft was unduly prejudicial and constituted reversible error. The method of selecting a grand-jury foreperson was not constitutionally improper, and the indictment by which Drinkard was charged is valid. Therefore, the Court of Criminal Appeals ruled correctly in regard to the method of selecting a grand-jury foreperson and correctly ruled that the indictment was valid. Because of the improper introduction of evidence, we reverse the Court of Criminal Appeals' judgment affirming Drinkard's conviction and sentence. The cause is remanded for proceedings consistent with this opinion. *Page 307 
OPINION OF NOVEMBER 19, 1999, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; REVERSED AND REMANDED.
Maddox, Houston, and See, JJ., concur.
Johnstone, J., concurs specially.
Cook, J., concurs in part.
Lyons, J., concurs in the result.
Brown, J., recuses herself.*
* Justice Brown was a member of the Court of Criminal Appeals when that court considered this case.
[1] 476 U.S. 79 (1986).
[2] In discussing Mr. L., the prosecutor first stated that he believed Mr. L.'s answer to a question about criminal charges was untruthful, "according to a police officer." Absent further information or "meaningful voir dire" on the subject, this reason alone would be insufficient to overcome a presumption of discrimination. See Ex parte Branch, 526 So.2d 609, 623 (Ala. 1987); Bush v. State, 615 So.2d 137, 140 (Ala.Crim.App. 1992); Walker v. State, 611 So.2d 1133, 1140 (Ala.Crim.App. 1992) ("A prosecutor cannot simply presume, without further questioning to `dispel any doubt,' that a veniremember, who is under oath, did not answer a question truthfully merely because the prosecutor has hearsay evidence to the contrary.").