The appellant, David Allen Woodard, was indicted for two counts of capital murder in connection with the death of Tommy Childress. Count I charged Woodard with murder made capital because it was committed during the course of a robbery, see § 13A-5-40(a)(2), Ala. Code 1975. Count II charged Woodard with murder made capital because it was committed during the course of a burglary, see § 13A-5-40(a)(4), Ala. Code 1975. A jury found Woodard guilty of the lesser-included offense *Page 1104 
of felony murder as to each count. The trial court adjudged Woodard guilty of two counts of felony murder and sentenced him to two consecutive terms of life imprisonment.
The evidence adduced at trial indicated that in September 1999, David Silver, his girlfriend Jolie Cook, and Woodard were living with Tommy Childress. On the evening of September 3, 1999, Woodard and Silver got into an argument with Childress. When Childress told Woodard, Silver, and Cook to leave his house, Silver grabbed Childress, hit him, and threw him to the floor, where he and Woodard kicked Childress repeatedly. Childress was then shot twice in the head with his own pistol. Conflicting testimony was presented as to whether Woodard or Silver shot Childress. Cook testified that both Woodard and Silver kicked Childress, but that Woodard was the one who shot Childress. Marshall Collier testified that he saw Silver, Cook, and Woodard sometime after the murder and that Silver admitted to him that he had shot Childress. After the murder, Woodard and Silver took money from Childress's pants pocket and a gold necklace Childress was wearing, and they fled the scene in Childress's pickup truck. The State presented evidence indicating that Childress's blood was found on the pants Woodard was wearing and on the shoes Silver was wearing when they were arrested the evening following the murder. Woodard confessed to law-enforcement officers that he was present during the murder, but he said that he did not beat or kill Childress. He claimed that Silver was the person who shot Childress and that he had actually tried to stop Silver. Woodard admitted, however, that after Childress had been shot, he took money out of Childress's pants pockets and that he drove Childress's truck away from the scene.
 I.
Woodard contends that the trial court erred in allowing testimony regarding the portion of the statement he made to police in which he stated that he had previously killed a man in North Carolina.
As noted above, police interviewed Woodard the day after Childress's murder; specifically, he was interviewed by Sgt. John Stewart and Deputy James Stallworth, both of whom are with the Baldwin County Sheriff's Department. The record reflects that the interview was not recorded and that the statement was not written or signed by Woodard. Rather, the testimony indicates that Sgt. Stewart and Deputy Stallworth took notes during the interview and that three to four days after the interview, Deputy Stallworth typed a narrative of what was said during the interview based on both his notes and Sgt. Stewart's notes. A copy of that narrative is in the record on appeal, but it was not introduced into evidence. The only evidence of Woodard's statement to police that was presented to the jury was the testimony of Deputy Stallworth. The copy of the typed narrative shows that during the interview, when asked whether he had killed Childress, Woodard replied: "If I killed him, I would not be alive now. Guilt would get the best of me. I killed a nigger one time and that was in self-defense. And you do not know what it's like to see that face in your dreams night after night. Guilt would get the best of me." (C. 144.) The record reflects that the killing Woodard was referring to occurred between 10 and 12 years before the present murder, and that Woodard had been arrested for the killing, but that the grand jury had not returned an indictment against Woodard.
Before trial, Woodard filed a motion to prohibit the prosecutor from introducing *Page 1105 
evidence of that portion of his statement[1] on the ground that evidence of the prior killing was inadmissible character evidence under Rule 404(b), Ala.R.Evid., that it was irrelevant, and that it was prejudicial.[2] The trial court heard arguments on the motion before trial. The State argued that the statement was admissible because, it said, it was the reason Woodard gave police to explain why he could not have killed Childress, which the State argued was a "silly" reason, and that "it shows the jury that this is not really the reason at all," that "this is all phoney." (R. 442.) The trial court then conditionally denied the motion, finding that because the statement was made after Woodard had been advised of his Miranda[3] rights, it was not prejudicial and was admissible; however, the trial court indicated that it would address the admissibility of that portion of the statement again when the issue arose during trial.[4]
Just before the testimony of Deputy Stallworth, Woodard renewed his objection to the admission of that portion of his statement referencing the earlier killing in North Carolina. The trial court overruled the objection. During direct examination of Deputy Stallworth, the following occurred:
 "[Prosecutor]: Did you ever ask him or was he asked, did you kill Tommy Childress?
"[Deputy Stallworth]: Yes, we asked him that.
"[Prosecutor]: What was his response?
"[Woodard's counsel]: And again, Your Honor, same objection.
"THE COURT: All right. Overrule the objection.
"THE WITNESS: I did not kill Tommy Childress.
"[Prosecutor]: Is that all he said, Jim Stallworth?
"[Deputy Stallworth]: No, sir.
"[Prosecutor]: Well, tell the jury what his response was.
 "[Deputy Stallworth]: He said, I killed a nigger one time and I can't get the face out of my dreams. You don't know what it's like every night to wake up and have this face in your, seeing this face every night.
 "And I couldn't live with the guilt that I would have gotten if I had killed Tommy."
(R. 1050-51.) Deputy Stallworth did not testify, in contrast to the written narrative that he prepared regarding Woodard's statement, that Woodard had told him that the prior killing was in self-defense. On cross-examination, Woodard's counsel attempted to question Deputy Stallworth *Page 1106 
about that portion of Woodard's statement by reading the language (that we quoted previously) from the narrative regarding Woodard's response. However, before counsel reached the portion of the narrative indicating that Woodard stated that the prior killing was in self-defense, the State objected, arguing that if Woodard's counsel read the narrative verbatim, it would introduce the typed narrative into evidence. The trial court overruled the objection, but stated that "we'll discuss whether or not it comes into evidence in a minute." (R. 1150.) Woodard's counsel then rephrased the question, asking Deputy Stallworth if he remembered Sgt. Stewart's asking Woodard if he had killed Childress and if he remembered Woodard's response. Deputy Stallworth stated that he did, and repeated what he had said on direct examination regarding Woodard's response, again leaving out that portion in which Woodard said that the prior killing had been in self-defense.
After cross-examination, Woodard's counsel requested that he be allowed to present evidence indicating that a North Carolina grand jury had declined to return an indictment against Woodard for the North Carolina killing on the ground that there was no probable cause. After a lengthy discussion, the trial court indicated that Woodard could present that evidence so long as it was not in the form of hearsay. Because the only evidence Woodard had was in the form of testimony from Huey Mack, Jr., a lieutenant with the Baldwin County Sheriff's Department, who had contacted authorities in North Carolina and had been told that the grand jury had not indicted him, he could not present that evidence to the jury. However, in response to the State's request, the trial court stated that it would allow the State to ask Lt. Mack if he had checked with North Carolina regarding the prior killing. The State made this request in order to lessen the implication raised by Woodard on cross-examination of Deputy Stallworth that the police had not been thorough in their investigation when Woodard asked Deputy Stallworth if he had checked with North Carolina authorities regarding the prior killing and Deputy Stallworth replied that he had not. In sum, although the jury was told that Woodard had admitted to killing a man previously, it was never informed that Woodard had said the killing was in self-defense or that Woodard had never been indicted for or convicted of the killing.
Rule 404(b), Ala.R.Evid., provides, in part:
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ."
Evidence of collateral crimes is "presumptively prejudicial because it could cause the jury to infer that, because the defendant has committed crimes in the past, it is more likely that he committed the particular crime with which he is charged — thus, it draws the jurors' minds away from the main issue." Ex parte Drinkard, 777 So.2d 295, 296 (Ala. 2000). In Robinson v. State, 528 So.2d 343 (Ala.Crim.App. 1986), this Court explained the exclusionary rule as follows:
 "`"On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This *Page 1107 
is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question."' Pope v. State, 365 So.2d 369, 371 (Ala.Cr.App. 1978), quoting C. Gamble, McElroy's Alabama Evidence § 69.01 (3d ed. 1977). '"This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors."' Ex parte Arthur, 472 So.2d 665, 668 (Ala. 1985), quoting McElroy's supra, § 69.01(1). Thus, the exclusionary rule serves to protect the defendant's right to a fair trial. '"The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged."' Ex parte Cofer, 440 So.2d 1121, 1123 (Ala. 1983); Terrell v. State, 397 So.2d 232, 234 (Ala.Cr.App. 1981), cert. denied, 397 So.2d 235 (Ala. 1981); United States v. Turquitt, 557 F.2d 464, 468 (5th Cir. 1977).
 "`If the defendant's commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.' Saffold v. State, 494 So.2d 164 (Ala.Cr.App. 1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App. 1984); Scott v. State, 353 So.2d 36
(Ala.Cr.App. 1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. '"Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects."' Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App. 1985), quoting United States v. Turquitt, supra at 468-69. `"`Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial." [Citation omitted.] "Of course, `prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"' Averette v. State, supra, at 1374."
528 So.2d at 347.
In this case, none of the exceptions to the exclusionary rule applies. The only argument the State made for admitting Woodard's statement regarding the prior killing in North Carolina was that it was the reason Woodard gave for why he could *Page 1108 
not have killed Childress. This, however, is not one of the exceptions to the exclusionary rule. Moreover, contrary to the trial court's finding, merely because Woodard was advised of his Miranda
rights before he made the statement does not make the statement admissible. The prior killing was not relevant to, or probative of, any issue in the case; it was completely collateral to the crime with which Woodard was charged. Therefore, we agree with Woodard that the portion of his statement referring to the North Carolina killing was inadmissible character evidence under Rule 404(b).
Moreover, the improper admission of the statement was not harmless.
 "In determining whether the admission of improper testimony is reversible error, . . . the reviewing court must determine whether the `improper admission of the evidence . . . might have adversely affected the defendant's right to a fair trial,' and before the reviewing court can affirm a judgment based upon the `harmless error' rule, that court must find conclusively that the trial court's error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant."
Ex parte Crymes, 630 So.2d 125, 126 (Ala. 1993). "Whether the improper admission of evidence of collateral bad acts amounts to prejudicial error or harmless error must be decided on the facts of the particular case."R.D.H. v. State, 775 So.2d 248, 254 (Ala.Crim.App. 1997).
The evidence in this case was not so overwhelming as to render admission of the statement harmless. Although it was undisputed that Woodard was present at the time of Childress's murder, the level of his involvement in the murder was hotly disputed, and the jury's verdict acquitting Woodard of the capital charges in the indictment, and finding him guilty of felony murder instead, suggests that the jury believed at least a portion of Woodard's version of events. Had it completely believed Woodard's version of events, however, the most the jury could have convicted Woodard of was robbery. According to Woodard's version of events, on the evening of September 3, 1999, Silver had gotten into an argument with Childress regarding Childress's "hitting on" Cook (R. 1050), and Silver had attacked Childress — stomping on him, and shooting him twice in the head. Woodard told police that he had tried to stop Silver from killing Childress, but that he was unsuccessful. He maintained that he was not involved in murdering Childress, but admitted that, after Childress had been killed, he took money out of Childress's pants pockets, and that he drove Childress's truck away from the scene. Woodard's version of events suggests that the murder and the robbery were two separate crimes, that the intent to rob was formed only after Childress had been murdered, and that, therefore, the murder did not occur "in the course of and in furtherance of" the robbery, as is required under § 13A-6-2(a)(3), Ala. Code 1975, for felony murder. See, e.g., Connolly v. State, 500 So.2d 57 (Ala.Crim.App. 1985) (noting that an accused is not guilty of capital murder or felony murder where the intent to commit the underlying felony is formed only after the killing).
In addition, contrary to the State's contention, Deputy Stallworth's testimony regarding Woodard's statement was not "cumulative" merely because Woodard's counsel elicited testimony about the statement on cross-examination of Deputy Stallworth. Although we agree that "testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be *Page 1109 
inferred," White v. State, 650 So.2d 538, 541 (Ala.Crim.App. 1994), overruled on other grounds, Ex parte Rivers, 669 So.2d 239
(Ala.Crim.App. 1995), Woodard should not be penalized merely because defense counsel attempted to lessen the impact of the improperly admitted evidence through cross-examination.[5]
Furthermore, the statement itself was highly inflammatory and prejudicial. The jury was permitted to hear that Woodard had admitted to killing a man previously, but was not informed that Woodard had said the prior killing was in self-defense or that Woodard had never been indicted for the killing. This suggested to the jury that the prior killing was not merely a collateral "bad act," but was, in fact, a prior crime.
Under these circumstances, we cannot say conclusively that the jury's verdict was not influenced by the improper admission of the statement. We conclude that the prejudicial effect of Woodard's statement substantially outweighed any conceivable probative value; that the trial court committed reversible error in allowing the statement into evidence; and that Woodard is therefore entitled to a new trial.
 II.
Although we are reversing Woodard's convictions for the reasons stated in Part I of this opinion, we address one of Woodard's other issues because it may arise on retrial.
Woodard contends that his convictions for two counts of felony murder under § 13A-6-2(a)(3), Ala. Code 1975 — murder during a robbery and murder during a burglary — for the murder of a single victim violate the principles of double jeopardy. We agree. In Ex parte Rice,766 So.2d 143 (Ala. 1999), the Alabama Supreme Court addressed an identical issue and stated:
 "Rice contends that § 13A-6-2(a)(3) provides for several different methods of committing a single offense — murder. According to Rice, the Blockburger [v. United States, 284 U.S. 299 (1932),] test, which the Court of Criminal Appeals applied in Weaver [v. State, 763 So.2d 972 (Ala.Crim.App. 1998),] and on which the State exclusively relies, is not applicable because, he says, § 13A-6-2(a)(3) defines a single offense. We agree.
"Section 13A-6-2 provides in part:
"`(a) A person commits the crime of murder if:
"`. . . .
 "`(3) He commits or attempts to commit arson in the first degree, burglary in the first or second degree, escape in the first degree, kidnapping in the first degree, rape in the first degree, robbery in any degree, sodomy in the first degree or any other felony clearly dangerous to human life and, in the course of and in furtherance of the crime that he is committing or attempting to commit, or in *Page 1110 
immediate flight therefrom, he, or another participant if there be any, causes the death of any person.'
 "(Emphasis added.) Murder is a class A felony, § 13A-6-2(c), and is punishable by a term of imprisonment for `life or not more than 99 years or less than 10 years,' see § 13A-5-2(f) and § 13A-5-6(a)(1), and by a fine of not more than $20,000, see § 13A-5-2(b); § 13A-5-11(a)(1). The cardinal rule of statutory interpretation is to determine and give effect to the intent of the legislature as manifested in the language of the statute. Absent a clearly expressed legislative intent to the contrary, the language of the statute is conclusive. Ex parte State Dep't of Revenue, 683 So.2d 980, 983 (Ala. 1996). This Court has explained:
 "`Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect.'
 "IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala. 1992); see, also, Johnson v. Price, 743 So.2d 436 (Ala. 1999).
 "The language used by the Alabama Legislature in § 13A-6-2(a)(3) is clear and unambiguous. Section 13A-6-2(a)(3) defines one criminal offense — murder. A `murder,' within the definition of § 13A-6-2(a)(3), may be committed by several different methods, and the State may allege and prove any one or all of those various methods in its attempt to establish the defendant's guilt. This Court held in Sisson v. State, 528 So.2d 1159 (Ala. 1988), that when a statute provides alternative or different methods of committing the same offense, each alternative method is not to be treated as a separate offense. Because we are dealing here with a single statute (§ 13A-6-2(a)(3)) that defines a single offense, the Blockburger test is not applicable. See, e.g., Sanabria v. United States, 437 U.S. 54, 70, n. 24, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) (`Because only a single violation of a single statute is at issue here, we do not analyze this case under the so-called "same evidence" test, which is frequently used to determine whether a single transaction may give rise to separate prosecutions, convictions, and/or punishments under separate statutes').
 "The sole remaining question is whether the Legislature has clearly expressed an intent to impose two life sentences for one murder. Our research has disclosed nothing that would indicate an intent on the Legislature's part to authorize the imposition of separate sentences corresponding to each method by which the offense stated in § 13A-6-2(a)(3) may be committed. In this regard, the Legislature has done nothing more than classify the offense of `murder' as a class A felony, and it has authorized only one sentence of imprisonment for that offense — `life or not more than 99 years or less than 10 years.'
 "Based on what we have stated above, we conclude that the trial court erred in adjudging Rice guilty of two murders and in sentencing him twice for his violation of § 13A-6-2(a)(3). . . ."
766 So.2d at 150-51. Our Supreme Court also stated in Ex parte Rice:
 "The judgment of the Court of Criminal Appeals is reversed and the case is remanded for further proceedings *Page 1111 
consistent with this opinion. We note that merely ordering that Rice's sentences run concurrently is not a constitutionally acceptable option. The Supreme Court stated in Ball v. United States, 470 U.S. 856, 864-65, 105 S.Ct. 1668, 84 L.Ed.2d 740
(1985):
 "`The remedy of ordering one of the sentences to be served concurrently with the other cannot be squared with Congress' intention. One of the convictions, as well as its concurrent sentence, is unauthorized punishment for a separate offense. See Missouri v. Hunter, 459 U.S. 359, 368[, 103 S.Ct. 673, 74 L.Ed.2d 535] (1983).
 "`The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence. The separate conviction, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. For example, the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction. See Benton v. Maryland, 395 U.S. 784, 790-91[, 89 S.Ct. 2056, 23 L.Ed.2d 707] (1969); Sibron v. New York, 392 U.S. 40, 54-56[, 88 S.Ct. 1889, 20 L.Ed.2d 917] (1968). Thus, the second conviction, even if it results in no greater sentence, is an impermissible punishment.'
 "See, also, Rolling v. State, [673 So.2d 812
(Ala.Crim.App. 1995)].
 "Neither is it an acceptable option to merely vacate one of Rice's convictions and its corresponding sentence. The jury specifically found that Rice had violated § 13A-6-2(a)(3) in two different ways — by participating in a kidnapping and causing Taylor's death and by participating in a robbery and causing Taylor's death. Based on the record before us, an appellate court's vacating one of Rice's convictions and its corresponding sentence would have the effect, albeit unintended, of nullifying a part of the jury's verdict. We think the better approach is for the Court of Criminal Appeals to remand the case to the trial court for the entry of a new order — an order that adjudges Rice guilty of Taylor's murder and sentences him for that single offense."
766 So.2d at 152-53. If this circumstance arises again on retrial, we caution the trial court that felony murder is but a single offense and that Woodard cannot be convicted of or sentenced for two counts of felony murder for the murder of a single victim.
For the reasons stated in Part I of this opinion, the judgment of the trial court is reversed and this case is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
McMillan, P.J., and Cobb, Baschab, and Wise, JJ., concur.
[1] Woodard actually styled this as a motion to redact. However, because there was no written statement by Woodard, there was nothing to redact, and both the trial court and the parties treated the motion as a motion in limine to prohibit the prosecutor from eliciting testimony about that portion of his statement.
[2] The motion also challenged another portion of his statement in which he referred to a previous arrest for illegal narcotics; the trial court granted the motion with respect to that arrest and instructed the prosecutor not to mention the drug arrest.
[3] See Miranda v. Arizona, 384 U.S. 436 (1966).
[4] Woodard also filed a motion in limine requesting that the prosecutor be prohibited from introducing evidence or referring to the fact that he had been arrested in North Carolina for that murder. Although the trial court denied the motion, it instructed the prosecutor not to mention the arrest in opening statements, and the record reflects that no evidence of the arrest was presented during the trial.
[5] Part of that cross-examination included asking Deputy Stallworth if he had contacted authorities in North Carolina regarding the prior killing, to which he replied he had not. As noted previously, in response to this questioning, the State requested that it be allowed to ask Lt. Mack if he had contacted North Carolina authorities regarding the prior killing, and the trial court granted the request. Because Lt. Mack's limited testimony regarding his contacting North Carolina authorities about the prior killing had been specifically allowed by the trial court in direct response to Woodard's cross-examination of Deputy Stallworth, we likewise reject the State's argument that evidence of the statement was merely "cumulative" of Lt. Mack's testimony, which was not objected to by Woodard at the time it was elicited.